*137 O’Connor, C.J.,
dissenting.
{¶ 18} I join Justice French’s dissent, which cogently explains the substantive problems with the majority’s decision. I write separately to address what I perceive as the majority’s disturbing judicial activism. The majority improperly creates a new mechanism for expungement that is contrary to the public-policy decisions made by the General Assembly as evidenced by the statutes it enacted, and it does so by using Pepper Pike v. Doe, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), as a smokescreen.

The statutory scheme

{¶ 19} The majority begins its analysis where it also should end: by recognizing that there is no statutory authorization for courts to seal records relating to civil protection orders (“CPOs”) in adult proceedings. That the majority must modify its assertion with the clause “in adult proceedings” is fatal to its rationale.
{¶ 20} By asserting that there is no statute that precludes sealing of records in adult proceedings and therefore the court may rule to allow it, the majority fails to acknowledge the significance of the General Assembly’s enactment of a comprehensive statutory scheme that permits the sealing of records related to CPOs but limits the applicability of the sealing provision to juvenile proceedings. If the legislature had wanted to afford adults the same sealing provision, it would have done so.
{¶ 21} In 2010, after more than a year of consideration, debate, and revisions, the 128th General Assembly enacted Am.Sub.H.B. No. 10 (“H.B. 10”), which is known as the Shynerra Grant Law and provides for the issuance of a CPO against a juvenile. The legislation was enacted in response to the death of Grant, who in 2004 secured the only judicial protection available to her, a no-contact order from the juvenile court, after her ex-boyfriend broke her jaw. Parents of Murdered Teens Say New Law Will Help Courts Curb Youth Violence, Hannah Report (Mar. 17, 2010); Senate Passes Bills on Juvenile Stalking, Railroad Crossing Regulation, Hannah Report (Mar. 9, 2010). At that time, the law did not provide Grant the option of obtaining a CPO against him because they were both minors. Id. Within the year, Grant’s ex-boyfriend fatally shot her and killed himself. Provance, New Ohio Statute to Safeguard Teens, The Blade (Mar. 17, 2010), available at http://www.toledoblade.com/local/2010/03/17/New-Ohio-statuteto-safeguard-teens.html#sSmUDJFjZiyUyLvt.99 (accessed Oct. 2, 2013).
{¶ 22} H.B. 10 created a proceeding in juvenile court for obtaining a CPO that parallels the proceeding applicable to adults. But in recognition of the unique considerations present when dealing with children, the General Assembly also enacted several special rules applicable only to juvenile proceedings. See the Judicial Impact Statement prepared by the Ohio Judicial Conference regarding *138 H.B. 10 (May 8, 2009) 2-3, available at http://www.ohiojudges.org/Document.ashx? DocGuid=3d216d2d-b9e0-435b-89c6-e86b557b28e8 (accessed Oct. 2, 2013) (offering the conference’s support for the legislation and emphasizing that the provision establishing exclusive, original jurisdiction over CPO proceedings against juvenile respondents is appropriate because common pleas courts “do not have the range of additional dispositionary remedies available to juvenile courts”). The sealing provision was one such measure. See id. at 5 (recognizing that the legislature wished to provide for sealing of records relating to CPOs in juvenile proceedings and suggesting that it could accomplish that goal by making applicable existing law that provided for sealing and expungement of juvenile court records relating to delinquency actions and traffic offenses).
{¶ 23} Notably, when H.B. 10 was first introduced in 2009, it contained no expungement procedure or sealing provision. 2009 H.B. No. 10, available at http://www.legislature.state.oh.us/bills.cfm?ID=128_HB_10_I (accessed Oct. 2, 2013). “One of the stumbling blocks in getting the bill passed was some lawmakers’ concerns that a single incident or a false accusation could haunt an individual into adulthood.” Provance, New Ohio Statute to Safeguard Teens, The Blade (Mar. 17, 2010), available at http://www.toledoblade.com/local/2010/03/17/ New-Ohio-statute-to-safeguard-teens.html#sSmUDJFjZiyUyLvt.99 (accessed Oct. 2, 2013).
{¶ 24} The bill was approved unanimously by the House of Representatives, 153 Ohio House Journal, First Regular Session, 631-632, but only after an expungement procedure was incorporated in R.C. 2151.34(E)(6), Sub.H.B. No. 10, unofficial version available at http://www.legislature.state.oh.us/bills.cfrn7ID= 128_HB_10_PH (accessed Oct. 2, 2013). The Senate replaced the expungement procedure with a sealing provision, Am.Sub.H.B. No. 10, unofficial version available at http://www.legislature.state.oh.us/bills.cfm7ID=128_HB_10JPS (accessed Oct. 2, 2013), and unanimously approved the bill, 153 Ohio Senate Journal, First Regular Session, 2498-2500; the House then approved the Senate amendments by a vote of 96 to 1, 153 Ohio House Journal, Second Regular Session, 2459-2462.
{¶ 25} The bill’s sponsor, Representative Edna Brown, explained that the sealing provision was added to ensure that juvenile respondents had “the opportunity for second chances.” Parents of Murdered Teens Say New Law Will Help Courts Curb Youth Violence, Hannah Report (Mar. 17, 2010). Likewise, Senator Bill Seitz explained that the juvenile-proceeding sealing provision, as enacted, was needed to “ensure that youths aren’t saddled for life with the fault of one childhood mistake.” Senate Passes Bills on Juvenile Stalking, Railroad Crossing Regulation, Hannah Report (Mar. 9, 2010).
*139 {¶ 26} After the enactment of H.B. 10, there is no question that the legislature intended that records relating to CPOs issued against adults stay in the public domain. Even though H.B. 10 modified some provisions applicable to both adult and juvenile proceedings, e.g., R.C. 3113.31 (A)(3)(a)(ii) (expanding the definition of “family or household member” to include a foster parent) and modified some laws governing adult proceedings in order to make them applicable to the new juvenile proceedings, e.g., R.C. 3113.31(L) (providing that a person who violates a CPO is subject to a criminal prosecution or a delinquent-child proceeding), the General Assembly did not authorize sealing of CPO records in adult proceedings.
{¶ 27} The maxim of statutory construction “expressio unius est exclusio alterius” means “the expression of one thing is the exclusion of the other.” “For example [according to the maxim], the rule that ‘each citizen is entitled to vote’ implies that noncitizens are not entitled to vote.” Black’s Law Dictionary 661 (9th Ed.2009). Likewise, the law that juveniles are entitled to seal CPO records implies that adults are not entitled to seal CPO records.
{¶ 28} Application of the maxim in this case is also consistent with the apparent intent of the legislators. State ex rel. Curtis v. DeCorps, 134 Ohio St. 295, 298-299, 16 N.E.2d 459 (1938) (explaining that the maxim is inapplicable when its use would defeat legislative intent). In enacting H.B. 10, the General Assembly drew a bright line between adult CPO proceedings and juvenile CPO proceedings. To that end, H.B. 10 modified the procedure for obtaining a CPO in adult proceedings by requiring that the petition allege that the respondent is 18 years of age or older. R.C. 2903.214(C)(1). And H.B. 10 gave juvenile courts exclusive jurisdiction over petitions for CPOs against minors. R.C. 3113.31(A)(2). Finally, the act provided that CPOs issued by juvenile courts against juvenile respondents are invalid once the respondent attains 19 years of age. R.C. 3113.31(E)(3)(a). Together, those provisions make clear that juveniles are not subject to the harsher adult procedures and adults cannot avail themselves of the more forgiving juvenile procedures.
{¶ 29} A judicial remedy may not contravene the public policy expressed in duly enacted, constitutional legislation. E.g., Sutton v. Tomco Machining, Inc., 129 Ohio St.3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶ 8, citing Painter v. Graley, 70 Ohio St.3d 377, 385, 639 N.E.2d 51 (1994). But rather than abide by the line drawn by the General Assembly, the majority opinion circumvents the Ohio Revised Code for the simple reason that it can.
Pepper Pike: the smokescreen
{¶ 30} The majority blithely asserts as support for its holding that “[i]n Pepper Pike v. Doe, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), we recognized that courts have inherent authority to grant the judicial remedy of expungement and sealing of records in ‘unusual and exceptional circumstances.’ ” Majority opinion at ¶ 3. In *140 so doing, the majority ignores the unambiguous wording of the first paragraph of the syllabus in Pepper Pike: “The trial courts in Ohio have jurisdiction to order expungement and sealing of records in a criminal case where the charges are dismissed with prejudice prior to trial by the party initiating the proceedings.” (Emphases added.) There was never a criminal case against Schussheim for his actions against Michelle D. Schussheim, n.k.a. Henneman, and one of their children. And the civil proceedings against him were dismissed without prejudice. Thus, Pepper Pike is inapposite.
{¶ 31} The majority extends Pepper Pike to civil proceedings. And it contends that its authority to do so springs from the Constitution. As Justice French explains, there is no constitutional right to expungement. Justice French’s dissenting opinion at ¶ 76.
{¶ 32} The majority claims that the authority comes from the constitutional right to privacy, which Pepper Pike stated was the “basis” for expunging records relating to a false criminal charge. Pepper Pike at 377. In so holding, Pepper Pike cited Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding that “the right of personal privacy includes the abortion decision”); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (declaring unconstitutional a state law that provided for the posting in liquor establishments of names of persons to whom intoxicating beverages could not be sold on the ground that persons subject to the state law were first entitled to notice and an opportunity to be heard); and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (overturning the convictions of two Planned Parenthood employees for violating state law that prohibited dissemination of information about birth control on the ground that the law violated the right to privacy).
{¶ 33} Pepper Pike recognized that the right to privacy justified expunging records that a court generated because a third party had perpetrated fraud on the court. The majority here expands Pepper Pike while ignoring that the state has a legitimate interest in maintaining public records that relate to valid court proceedings.

This case is not “unusual or exceptional”

{¶ 34} That this case is not a criminal case is not the only fact that distinguishes it from Pepper Pike. It is equally important to recognize that this case is not, as in Pepper Pike, a case in which court records arose from a person’s use of the court as a vindictive tool to harass. Pepper Pike, 66 Ohio St.2d at 377, 421 N.E.2d 1303 (holding that there is no compelling state interest in retaining criminal records in the unusual and exceptional circumstance where the records “arise from a domestic quarrel and constitute vindictive use of our courts” [emphasis added]). In fact, the contrary conclusion must be drawn here.
*141 {¶ 35} In her petition for the CPO, Henneman alleged that her then husband, Alan C. Schussheim, had committed two acts of domestic violence against their daughter on two separate days. Henneman stated under oath that on July 2, 2009, “[i]n a hotel room on vacation, our daughter was unsuccessfully trying to open medicine. My husband harassed her over it, then backed her up against * * * a wall, yelled at her 1 inch from her face then pushed her into the wall. I intervened and was subsequently shoved backward against a bed which I fell over and onto the floor.” Henneman also stated under oath that nine days later, on July 11, 2009, Schussheim “threatened and intimidated our daughter, shoved her against [a] wall in a closed room.”
{¶ 36} Two days after the second incident of abuse, Henneman successfully petitioned the court for an ex parte domestic-violence CPO. The judge who heard her allegations and had the opportunity to evaluate her credibility in making the assertions against Schussheim ordered him to vacate the home and stay at least 100 yards away from Henneman and their daughters.
{¶ 37} In response, Schussheim did not move to set aside the CPO on the ground that it was incorrect or inappropriate, even though a local rule expressly provided for an expedited hearing on such a motion and even though any modification thereby could “be made retroactive to the effective date of the ex parte order.” Loc.R. 2.9A of the Court of Common Pleas of Warren County, Domestic-Relations Division. Instead, Schussheim filed a facially frivolous motion to dismiss the matter for improper venue because the family was in Pennsylvania at the relevant times.
{¶ 38} On July 21, 2009, the court held a hearing in response to the CPO. Schussheim attended, represented by counsel. After the hearing, the court modified the CPO to permit Schussheim visitation with the daughters — only if it was supervised — and to permit limited communications by e-mail between Schussheim and Henneman.
{¶ 39} The court determined that the CPO should otherwise remain in full force, and it extended the CPO’s effect to July 13, 2010. Several weeks later, Henneman moved the court to dissolve the CPO. After a hearing, the court dismissed the CPO without prejudice.
{¶ 40} Nearly two years later, Schussheim moved to expunge and seal the record of the CPO proceedings. In support of his motion, he filed Henneman’s affidavit, which was printed on Schussheim’s attorney’s letterhead. In its entirety, the affidavit provides:
1. Iam the Petitioner in the above captioned matter;
*142 2. I have no objection to the application of Alan C. Schussheim’s Application to Expunge and Seal the Record of Case # 09DV4460;
3. Alan C. Schussheim was never charged with an act of domestic violence related to this incident or at any other time during our marriage;
4. Alan C. Schussheim and I co-parent our two minor children;
5. I believe it would be in the best interest of both myself, Alan and our children if the record of proceedings in this matter was expunged and sealed.
{¶ 41} This case is ordinary and usual: There is nothing to indicate that this CPO was not issued for valid reasons.
{¶ 42} The underlying CPO case was dismissed without prejudice, giving rise to the inference that Henneman’s motion to dissolve the CPO was based on changed circumstances rather than on a recantation of the facts she swore to in order to obtain the CPO. That Henneman no longer needed the CPO after four weeks does not change the fact that she needed it in the first instance. And that she shortly thereafter notified the court that the CPO should be dissolved gives rise to the inference that she had responsibly, rather than vindictively, used the courts to secure only the protection that she needed for only the time period that she needed it.
{¶ 43} With regard to Schussheim’s application to expunge that he filed two years later, Henneman’s affidavit states, without explaining, that she has “no objection” to Schussheim’s application because it would be in the family’s best interest to seal the record. She states in her affidavit that Schussheim was never charged with domestic violence in connection with the allegations contained in the CPO petition, but she does not state that he never committed the domestic violence described. Henneman has never recanted the allegations of domestic abuse and never claimed to have sought the CPO for incorrect or inappropriate reasons.
{¶ 44} Moreover, Schussheim has never denied the acts described in the underlying petition. Notably absent from the record is any affidavit from Schussheim stating that the allegations set forth in the CPO petition are untrue. One would imagine that Schussheim would have readily sworn out such a statement if he could have done so truthfully.
{¶ 45} What, then, would justify sealing the records in this case? Henneman is entitled to express her lack of opposition to Schussheim’s application, but the fact that she does not oppose his application does not entitle him to relief. See Pepper Pike, 66 Ohio St.2d at 377, 421 N.E.2d 1303 (explaining that exceptional *143 circumstances that justify sealing criminal records exist where the records relate to a vindictive use of our courts).
{¶ 46} There is no need to remand this case for an application of the Pepper Pike balancing test because even under Pepper Pike, a trial court’s authority to expunge is limited to eases “where such unusual and exceptional circumstances make it appropriate to exercise jurisdiction over the matter.” Pepper Pike at paragraph two of the syllabus. Such circumstances do not exist here. Nevertheless, the majority remands for exactly that purpose, and in doing so, it makes the heavy-handed assertion that “unusual and exceptional circumstances appear to exist in this case.” Majority opinion at ¶ 17.
{¶ 47} That assertion is curious both in light of this record and in light of the fact that the trial court already applied the Pepper Pike balancing test and determined that Schussheim was not entitled to expunge the records. After concluding that Pepper Pike did not apply in this case, the magistrate explained:
Even, however, applying the balancing test of Pepper Pike v. Doe, the request to seal the record in this case is denied. Here, the only reasons [Schussheim] provided for sealing the record is that the case was dismissed and that there have been no further acts or conduct of domestic violence and no criminal charges pending and that he fears the record could inhibit future employment.
{¶ 48} Accordingly, the magistrate recommended denying the application to seal. The trial court adopted that recommendation, over Schussheim’s objections.
{¶ 49} Is there any reason to believe that the outcome will be different on remand? If so, the majority has not only extended Pepper Pike but has also redefined “unusual and exceptional.” In any event, the majority opinion is pure legislation.
{¶ 50} This case perfectly illustrates the problem with the judiciary involving itself in policy-making.

No adversarial testing

{¶ 51} This case was litigated without the benefit of adversarial debate. And Schussheim’s attorney, Jerry H. Shade, glossed over some points that must be highlighted.
{¶ 52} Attorney Shade represented to this court in his brief that “[t]he incident that formed the basis for the ex-parte order did not actually involve domestic violence, but was exaggerated so that [Henneman] could secure tactical advan *144 tage prior to filing for divorce.” He repeated this assertion at oral argument. The record, however, suggests that that assertion is not true.
{¶ 53} Contrary to Shade’s assertion, the acts alleged in the CPO constituted domestic violence. See R.C. 2919.25(A) through (D) (defining domestic violence). According to the petition, twice within two weeks, Schussheim shoved one of his daughters against a wall. But Shade repeatedly asserted that “there was no violence alleged.” That is simply not true. The acts of domestic violence plainly involved physical violence.
{¶ 54} Shade also represented that Henneman had exaggerated the incidents of domestic violence in order to gain an advantage in an upcoming divorce. That assertion is totally without support in the record. In fact, the opposite appears to be true. As I have already explained, there is every indication that the CPO was issued for valid reasons. Henneman did not object to the records’ being expunged. That position does not translate into a recantation of the allegations or a confession of improper motive in securing the CPO.
{¶ 55} Yet Shade represented to the court during oral argument that Henneman’s affidavit, which was printed on Shade’s letterhead, stated that the allegations contained in the CPO petition were not true. It is difficult to believe that Shade would not have been aware of the inaccuracy of that statement when he made it to the court.
{¶ 56} Finally, Shade repeatedly referred to the ex parte order issued in this case. In doing so, he failed to mention that eight days after the court issued the ex parte CPO, it conducted a hearing to give Schussheim an opportunity to respond to the ex-parte order. Schussheim was present at that hearing, as was his counsel, James Whitaker, who was Shade’s law partner at the time. That hearing provided an opportunity for Schussheim to be heard. And it resulted in the court’s issuing an additional order, and that order reflects the court’s determination that the CPO should remain in effect for a year. Schussheim also wants that record to be sealed.
{¶ 57} The sparse and limited information before this court stands in sharp contrast to the extensive and expansive information that was before the General Assembly when it in enacted H.B. 10. The rule of law that this court issues in this case will apply to CPO cases throughout Ohio.
{¶ 58} In enacting H.B. 10 and limiting the sealing provision to juvenile proceedings, the General Assembly heard from opponents and proponents of the bill, including numerous experts in domestic violence and the law. The legislators also considered testimony from domestic-violence victims. The bill was drafted with input from the Juvenile Judges Association and the Family Violence Prevention Center Advisory Council of the Ohio Department of Public Safety. *145 Bills Would, Change Ohio’s ‘F’ for Efforts to Protect Teens from, Dating Violence, Hannah Report (Mar. 24, 2009).
{¶ 59} We, on the other hand, heard from one lawyer on one side of one case.
{¶ 60} With this limited information, we cannot know whether the majority’s new law is good public policy for Ohio. As a practical matter, there is great potential for unintended consequences in the majority’s decision. Most obviously, it increases the risk that respondents will use fear, intimidation, false promises, or threats to procure favorable affidavits from domestic-violence victims.

Conclusion

{¶ 61} Our democracy is not designed to permit four justices to heedlessly override the studied policy judgment of 129 legislators and one governor. Unfortunately, the majority fails to exercise the judicial restraint on which the design relies. Because I do not condone the majority’s judicial activism, I dissent.
{¶ 62} But I am left with the lingering question of how far the majority will go to bury these records for Schussheim. Will it order this opinion to be sealed if Schussheim prevails on remand?
Lanzinger, J., concurs in the foregoing opinion.